[Crim. No. 13912.   Second Dist., Div. Three.   Oct. 15, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. ARMANDO CAMARILLO, Defendant and Appellant.

Arthur Leeds, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Stanton Price, Deputy Attorney General, for Plaintiff and Respondent.

SHINN, J.*—Accused by information of murder in count I and in count II of assault with a deadly weapon with intent to commit murder, in a jury trial Hector Enrique Tovar and Joseph Bautista were convicted of manslaughter on count I and acquitted on count II; appellant Armando Camarillo and Eugene Rubio, Jr., were convicted of murder of the second degree and of assault with a deadly weapon in violation of section 245 of the Penal Code. Appellant was sentenced to state prison for each offense, the terms to run concurrently; he filed a late notice of appeal under order of the Supreme Court and counsel was appointed.

The questions on appeal are (1) did appellant intelligently waive his rights when questioned by the police, (2) did appellant suffer prejudice through the admission in evidence of extrajudicial statements of appellant's codefendants, (3) was the evidence sufficient to prove appellant's guilt as an aider and abettor in the crimes, and (4) was the introduction of extrajudicial statements of appellant's codefendants error under the doctrine of *People* v. *Powell,* 67 Cal.2d 32 [59 Cal. Rptr. 817, 429 P.2d 137]. We conclude that none of appellant's contentions is sustainable and that the judgment must be affirmed.

The crimes were committed about 11 p.m. March 5, 1965, in a residential section of Los Angeles. In the presence of the four defendants a 15-year-old boy named Ruben Dominguez

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

was stabbed twice by Rubio with a pocket knife as charged in count II. The victim of the murder was Tommy Garcia, a young boy who was stabbed in the heart by Rubio in the presence of the other defendants.

Hazel White who lived close to the scene of the crimes testified that about 11:30 p.m. March 5, 1965, she "heard a loud metallic noise." She looked out her window onto Portola but saw nothing. As she approached her door, she heard three low, very thick voices. They seemed to be angry. She heard another voice asking the three why they were picking on him and saying that he didn't do it.

She looked out her front door. She saw four boys walking towards Oakland. She watched them. Suddenly one of the boys took a couple of steps backwards and started running down Oakland. One of the other boys gave chase with his arm upraised as if he wanted to grab the boy. The remaining two boys ran to the middle of the intersection, watched the other boys for a moment and then started running after them.

Mrs. Jerry Collins who lived near Mrs. White testified. On March 5, 1965, at around 11:30, she heard three or four sets of footsteps running from Portola up Oakland. Then the street became quiet, and she heard a male voice saying, "Let's get out of here."

She was trying to go to sleep when she heard a very loud groan. She opened her door and looked outside. There was what appeared to be a shadow across the street from her house. She called the police.

Officer Aguirre found the body of Tommy Garcia about midnight. He had been stabbed in the heart; there was evidence that he had suffered four separate blows to the face.

Ruben Dominguez testified he was walking north on Eastern Avenue with his girl friend, Jenny Derian, at about 11 p.m. on March 5, 1965. The couple was coming from a dance at Wilson High School.

At the intersection of Templeton and Eastern, Ruben was accosted by appellant and another boy. The two boys asked Ruben how the dance was, and if he knew where there were any parties. Ruben said no. Rubio and a fourth boy joined appellant and his companion, asking the same questions. Again, Ruben said he did not know where there were any parties.

As they continued walking past a car wash and gasoline station, appellant put his arm around Jenny. Ruben "sort of pushed him" and told him not to "mess around." Appellant

hit Ruben at the side of his jaw. One of the four boys said, "Leave them alone, they're too young" and crossed to the other side of the street. This boy, who appeared to be on the outside of things, resembled Bautista.

Several seconds later, while the other two were standing around him, Rubio stabbed Ruben in the back. Ruben moved away. Having felt the blow but not aware that he had been stabbed, Ruben staggered out onto the street, then returned to the sidewalk. Rubio stabbed him again, this time in the stomach. At this point Ruben saw the knife. The three boys started running up Eastern Avenue towards Huntington Drive. After awhile they caught up with the fourth boy who had previously crossed the street.

Ruben was subsequently hospitalized, received stitches, and had medical treatment for about a month after he was released from the hospital.

On cross-examination Ruben testified that he did not shove appellant but merely tried to remove his arm from around the girl, and that he was stabbed by Rubio "right after he [appellant] hit me in the jaw."

While appellant was under arrest he was advised by Officer Aguirre that before he made any statement he had a right to have an attorney present during the interrogation, that he had a right to remain silent and that any statements he might make could be used against him in any future court proceedings. Officer Aguirre asked appellant whether he understood what the officer meant and explained about constitutional rights and appellant told him in his own words that he understood all his constitutional rights.

Appellant's statements were written down, were typed, read to him and by him and signed. They were read in evidence as follows: "Me and Joe and Gene were at Hector's house and we had some beer there. We left to go look for a party on the other side of Huntington Drive. We walked down Gamber street and then up Eastern toward Huntington Drive. We met the first couple, a young guy and his girl, by the car wash. And I asked them where they were coming from. And the other guys also asked questions. They said that they came from the dance at school and were going home.

"I put my arm around this girl and then the pushing started. He came toward me and I pushed him with both hands. Little Joe and I then started to leave by crossing the street, when the guy that had the knife (indicating Gene) cut him. I thought that Gene had just hit him, because they just

walked off. I didn't know that Gene had a knife.

"I heard later at the pizza place that the kid had been cut.

"We walked toward Portola to look for the party. The four of us were together when we met this guy called Tommy, on Portola, near Oakland. I asked him where the party was, and he looked at us real funny and started laughing. He got salty and we all started pushing except Joe.

"Then the guy ran and we all followed him. I had to run because he was running. He was down on his stomach when I got there. I was last. I could see him breathing, but I knew he was dying because I know Gene.

"Then we all left through the alley. I said 'Let's make it.' I don't know if anyone took his wallet. We were together.

"The next day we talked about it, but I didn't—I just listened as usual.

"Witnessed Sergeant R. R. Brunell, 5227 Highland Park Juvenile, 4/22/65.

"Witnessed Sergeant J. F. Aguirre, 4161 Highland Park, 4/22/65.

"Signed Armando Camarillo."

While under arrest Rubio was questioned by Officer Aguirre. He was informed of his constitutional rights as appellant had been informed and he said he understood them and freely and voluntarily made and signed the following statement. He remembered the night of March 5th when Tommy Garcia had been killed. That evening around 7 p.m., he went to Hector Tovar's house on Zane Street. Bautista and appellant were already there. They had a case of beer and drank about a six-pack apiece.

They had heard about a party on Navarro and they left Tovar's house, apparently to go to it, taking a path towards Eastern. When they arrived on Eastern Avenue, they did not see anybody on the street. Later they saw Ruben Dominguez and his girlfriend near the El Sereno Liquor Store.

At the time Rubio had an old knife with a three-inch blade in his pocket that he had obtained from a friend in school. Rubio had been waiting for a bus when the boy showed him the knife. Rubio was still looking at the knife when the bus came by; the boy got on the bus, and left the knife behind.

When Rubio and his friends approached Ruben and his girl friend, appellant asked where the party was and began pushing the boy around. Rubio told Ruben "to split, to make it," but the boy refused to do so. Rubio stabbed him. Rubio

walked away, but as the boy still had not left, he returned and again told him to "make it," and again stabbed him, this time in the stomach. Ruben ran into the street and the girl ran after him.

Rubio and his friends crossed Eastern Avenue, going towards Navarro Street. When they got to Oakland, they saw Tommy Garcia walking along. Appellant stopped Tommy and started to pick a fight with him. Rubio asked where the party was and Tommy pointed in the direction opposite from which he had been coming. Rubio said he didn't believe him and that they thought Tommy was lying. They told him they meant business. The boy started laughing and at that time Rubio stabbed him.

The boy turned around and ran up Oakland Street. Appellant started running after him and Rubio followed. When they came to the dead-end of Oakland, the boy fell on his face. When they reached the boy he was getting up on his hands and knees. Appellant came up to him, kicked him in the side, and the boy fell in the street again; then appellant kicked him on the head. They left him there and went up the alley.

Rubio kept the knife until he got home. Then he threw it in the backyard of his home. Monday, before he went to school, he found the knife and tossed it into some bushes on a hill. A search was made later of the area where Rubio said he threw the knife, but the knife could not be found.

At approximately 7 o'clock on April 21, 1965, Demar Pilkington, a police officer for the City of Los Angeles, had a conversation with Rubio at the Police Administration Building (where he was arrested) in the presence of Officer Jacques. Prior to this conversation, Officer Pilkington advised Rubio that he had a right to have an attorney with him at all times, that he had a right to remain silent, and that anything he said could be used against him in court.

Rubio said that he, Bautista, and appellant were over at Hector Tovar's house, drinking beer, on the night of March 5, 1965. After they finished the beer they walked down Eastern Avenue, where they ran into a boy and girl. The boy got mad at Rubio and his friends because they were talking to the boy's girl friend. Rubio said, ''I told him everything was all right, go ahead and leave. He didn't leave so I cut him with my knife. He left for a little while and came back, and I cut him again. I cut him once in the stomach and once in the back.

''After this here, we split, we left. We walked to Portola

Street where we walked into this other boy Tommy Garcia. There were a few words said about a party, and we asked him where this party was, and he pointed one way and then he pointed another.

"Armando [appellant] grabbed him and got mad and told him, 'You're coming with us. And if you're lying, we're going to do you in.' It was at this time I jumped in and told the guy to split. He looked like he was getting smart and wouldn't leave, so I stabbed him once in the chest with the same knife. He ran up Oakland and I chased him. He fell on his knees and Armando kicked him in the head about six times. He then fell on his face. I reached down and took his wallet out of his back pocket, because I thought he might have some money in it. Then we all walked down the alley toward Huntington Drive. The wallet didn't have any money in it.

"And after we split up, I stashed the wallet in an empty lot next to the drug store on Huntington Drive.

"The next day Hector told me he went back after it and tore it up and got rid of it.

"I threw the knife in an empty lot next to the school by my house."

Rubio testified in the trial as follows: He went over to Tovar's house at around 7:30 where he joined the other defendants. They had about three six-packs of beer. Rubio drank over one six-pack; Tovar consumed most of the rest.

Rubio had a three-inch pocket knife with him. He got the knife from a boy at a bus stop.

Rubio could not remember how it happened, but a little later he met a couple. Appellant was arguing with the boy, and Rubio asked appellant to leave, but appellant would not take no for an answer. Rubio also asked the boy to leave, but the boy said no; so Rubio stabbed him. Rubio could not remember where he stabbed the boy, but the boy came back and Rubio again asked him to leave. The boy said no, and Rubio again stabbed him. He was not trying to kill the boy, only trying to scare him.

The four continued walking, looking for a party on Navarro Street. At some time Rubio drank some gin. They met the victim, Tommy Garcia, and started talking to him. Rubio asked where the party was and Tommy said it was on Navarro Street. Rubio thought Tommy was lying. The boys started laughing as if it were a joke. Appellant said, "If you're lying to us, we're going to do you wrong." Rubio stabbed him. He

had no intention of killing Tommy; he just wanted to scare him.

Tommy started running and Rubio chased him. The boy fell on his hands and knees. Appellant kicked him in the head a couple of times. Rubio took his wallet. Then they left, looking for the party.

Rubio had no intention of robbing the boy when he stabbed him.

Only Bautista later brought up the event.

Bautista testified in the trial; he noticed his companions were bothering Ruben Dominguez and the girl; he crossed the street and did not see any knife or any blows struck. His account of the encounter with Tommy Garcia was essentially the same as that given by Rubio except that he saw Rubio kick Tommy while he was down.

Tovar made two statements to the police after being advised as to his constitutional rights. One of the statements was read in evidence. He said that as they left his house after drinking three six-packs of beer, he reminded Rubio to leave his knife behind "because he is pretty wild with it." It was a little 4-inch jacknife with a brown handle. He saw Rubio stab Ruben Dominguez and put the knife back in his pocket.

▆ We consider first the claim of error in receipt of the proof of appellant's statement. The record does not support the contention there was an insufficient showing that Camarillo understood and intelligently waived his right to have the assistance of an attorney and to remain silent. Evidence of his statements to Officer Aguirre was objected to upon the ground that appellant was under the age of 18 and without the capability to waive his rights. It is said, and not questioned, that he was 17 years old. The court could properly assume that Camarillo was possessed of normal intelligence and could properly act in reliance upon that assumption in the absence of any reason for suspecting that appellant suffered from a want of intelligence and understanding. If Camarillo's attorney had had any doubt as to his client's ability to understand and intelligently waive his constitutional rights it would have been his duty to inform the court of that fact. If he had received information from Camarillo which caused him to doubt the fairness of the questioning he no doubt would have learned of all the circumstances of the interrogation through cross-examination of Officer Aguirre. There was no such cross-examination.

Prior to the offering of appellant's statement the court had

heard the testimony of Mrs. White and Mrs. Collins of hearing voices of four boys in the street and of their running away. Officer Aguirre had testified to finding the body of Tommy Garcia on the scene. Ruben Dominguez had given his testimony. The court could have inferred from the conduct of appellant, in roving about at late hours, committing crimes of violence, and associating with the codefendants that he had acquired a degree of wordly experience unusual for one of his age.

There was nothing before the court to create a doubt that Camarillo was possessed of the intelligence and understanding of a normal 17-year-old boy. The sole ground of the objection was that he was a juvenile, and the objection was properly overruled.

■ "[A] minor has the capacity to make a voluntary confession, even of capital offenses, without the presence or consent of counsel or other responsible adult, and the admissibility of such a confession depends not on his age alone but on a combination of that factor with such other circumstances as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement." (*People* v. *Lara,* 67 Cal.2d 365, 383 [62 Cal.Rptr. 586, 432 P.2d 202].) In *Lara* the court explained fully the law with respect to the confessions and admissions of minors as it then existed in California. The voluntariness of a minor's statements is to be determined from the totality of the circumstances in which they were made. Among the circumstances to be considered in the case of appellant were his youth and the absence at the interrogation of a parent, a friend, or a lawyer. These conditions, together, did not impair the voluntariness of the statement nor did any other condition exist which the law recognizes as a ground for excluding the statement.

Upon the evidence that was before the court the determination that appellant intelligently and knowingly waived his constitutional rights must be regarded as conclusive.

Appellant contends he did not aid and abet Rubio in the commission of the crimes and therefore was not guilty. ■ Aid and abet has been established as meaning "to instigate, encourage, promote, or aid with guilty knowledge of the wrongful purpose of the perpetrator." (*People* v. *Goldstein,* 146 Cal.App.2d 268, 272-273 [303 P.2d 892].) ■ To assist in or contribute to the commission of the act with guilty knowledge is to aid and abet.

The basic ingredient of the crimes was assault upon the

persons of Ruben Dominguez and Tommy Garcia; the purpose was to cause physical injury, and the injuries caused by appellant's fists and those caused by Rubio's knife differed only as to degree. Appellant was the aggressor in each assault —he was the instigator. Rubio stood by when appellant assaulted Ruben Dominguez, and he joined appellant in the assault upon Tommy Garcia after the stabbing. Appellant was the one who threatened Tommy, saying, "If you're lying to us, we're going to do you wrong"; and when Tommy smiled Rubio stabbed him in the heart. When appellant incited Rubio to attack the two victims, and especially after the attack on Ruben Dominguez, he took the chance that Rubio might possess and use a deadly weapon. The jury presumably believed that if appellant had not started an altercation with Ruben, Rubio would not have stabbed him, and that if appellant had not assaulted Tommy and threatened him, Rubio would not have stabbed Tommy Garcia. These were reasonable inferences and fully justified the determination of the jury that appellant aided and abetted Rubio in the assault upon Ruben Dominguez with a deadly weapon and in the murder of Tommy Garcia.

Without repetition of the testimony of Ruben and the admissions of appellant, it suffices to say that they provided corroboration of the testimony of Rubio sufficient to reasonably convince the jury that Rubio had told the truth as to the involvement of appellant in the commission of each offense. If Rubio had not testified at all, the evidence would have supported the verdict against appellant as to each of the crimes.

When the statement of Bautista was offered it was objected to by his attorney upon the ground that it was not shown that Bautista understood his constitutional rights. The objection was overruled. Rubio's statement was objected to upon the ground the corpus delicti had not been established. Upon assurance by the district attorney that the corpus delicti would be proved the court admitted the statement out of order.

Each time evidence was received of an extrajudicial statement, or a defendant testified, the court carefully and fully instructed the jury that the statement or testimony was not to be considered as relating to any defendant except the one who gave it. The court and the attorneys understood that the statements would be admissible if the jury was instructed as to the limited purpose for which the evidence was received.

Under the rules stated in *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], which are applicable in the present case because the judgment was not final at the time of the decision of *Aranda* (*People* v. *Charles,* 66 Cal.2d 330 [57 Cal.Rptr. 745, 425 P.2d 545]), the court should have, if possible, deleted from the extrajudicial statements all portions harmful to codefendants; if that could not be done the statements should have been excluded or separate trials should have been granted.

Citing *People* v. *Powell,* 67 Cal.2d 32 [59 Cal.Rptr. 817, 429 P.2d 137], appellant contends that apart from the failure to follow the procedure prescribed in *Aranda,* it was error to admit statements of the codefendants because they were inadmissible against the makers. It is shown by the record that each of the statements was given voluntarily after each defendant had been advised of his rights. No reason was shown for doubt that the defendants fully understood their rights and voluntarily waived them. There was error in failing to follow the *Aranda* procedure, but it did not necessarily, and, in fact, did not result in prejudice. (See *People* v. *Hill,* 66 Cal.2d 536 [58 Cal.Rptr. 340, 426 P.2d 908].)

Although the court's admonitions respecting the extrajudicial statements were not necessarily sufficient to remove the threat of prejudice, it is reasonable to believe that the jurors could and did heed the admonitions and thereby the likelihood of prejudice was minimized, if not removed entirely.

Particular attention is directed to a few of the statements of the codefendants which it is contended prejudicially implicated appellant in the crimes. In brief they are the following: Tovar, who did not testify, stated in his first account given to the police that appellant "grabbed" Tommy; after Ruben was stabbed the defendants talked about it and Rubio described the knife; appellant thereafter "got into the act too." As to these related incidents, appellant admitted to having "pushed" both Tommy and Ruben but his pushing Ruben consisted of hitting him on the jaw with his fist. After Tommy was stabbed appellant chased him until he fell and he admitted that he knew Tommy was dying "because I know Gene." (Rubio.) Knives were no novelty with this group. While the four were drinking at Tovar's a 12-inch knife was lying on the table. Appellant saw Rubio hit Ruben two blows and could have seen that they were not mere blows with the fist. Rubio stated in his confession that appellant had grabbed Tommy and started to fight with him but his testimony in the

trial was to the contrary. Appellant had admitted "pushing" Tommy, and Rubio testified that appellant had threatened Tommy. Rubio stated that appellant kicked Tommy while he was down and Tovar made the same statement. Bautista testified it was Rubio who kicked Garcia and took his wallet. In his statement to the officers Bautista remarked that appellant had done "time," thus implying that he had been incarcerated for some offense. Since Camarillo was only 17 years old at the time of the trial the statement no doubt would have been understood by the jury to mean that Camarillo had been in trouble with the juvenile authorities. The slight blemish upon appellant's character that may have been cast by Bautista's remark was insignificant as compared with the felonious conduct of appellant that was described to the jury.

Appointed counsel has discussed by letter to the court the opinion of the court in *Bruton* v. *United States,* 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], decided after the briefs herein were filed. It is contended that the court in *Bruton* held it to be reversible error to admit evidence of an extrajudicial confession which implicates the appellant, regardless of cautionary instructions and regardless of the circumstances. The codefendant who implicated Bruton was not a witness in the trial. The court held that an instruction that the confession was only to be considered as against the maker, was not an adequate substitute for Bruton's constitutional right of cross-examination. The court did not hold that proof of a confession implicating an appellant would require reversal in every case. The codefendant had confessed that he and Bruton had committed an armed postal robbery which statement, the court said, was powerfully incriminating. It was held in *Bruton,* and made even more clear in the concurring opinion of Mr. Justice Stewart, that the rationale of the Sixth Amendment's confrontation clause is to exclude damaging extrajudicial statements of a codefendant who is not subject to cross-examination.

Appellant's right of cross-examination was restricted as to Tovar, but not as to Rubio and Bautista who testified in their own defense. It should be apparent from our foregoing statement of the evidence that the extrajudicial statements added only unimportant detail to the actions of the four defendants which constituted the crimes.

In reaching this conclusion it has been helpful to give consideration to the impact of the entire evidence upon the minds of the jurors as reflected in their verdict. They did not deter-

mine the question of the guilt of each defendant upon the basis of his active participation in the attacks upon Ruben Dominguez or Tommy Garcia. Tovar and Bautista were convicted of manslaughter, although there was no evidence of their active participation except the accusation that all but Bautista joined in "pushing" Garcia. They were convicted as members of the group that assembled in Tovar's home, saturated themselves with beer, and at 10 o'clock at night set forth to find some party that was under way. The jurors gained first hand knowledge of a type of lawbreaking that has become common and notorious in and about Los Angeles.

It is of almost daily occurrence that the newspapers and other disseminators of news give accounts of violent assaults and occasional murders committed by these groups of juveniles. The jury recognized the four defendants as a group that roamed the streets at night with the intention of causing trouble and looking for a party that was under way as a likely place to find it. The jury believed the defendants were acting in cooperation with each other and with a common purpose.

The attacks upon the two young boys were without considerable provocation and, hence, impliedly were committed with malice. (See Pen. Code, § 188.) It was within the province of the jury to determine that Camarillo and Rubio were actuated by malice while Tovar and Bautista were not and were, therefore, guilty only of manslaughter. (Pen. Code, § 192.)

It was upon the testimony of Ruben Dominguez, Rubio and Bautista and his own admissions that the jury found appellant guilty of second degree murder. Appellant argues that the judgment should be reversed unless this court is convinced beyond a reasonable doubt under the rule of *Chapman* v. *California*, 386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 87 S.Ct. 824], that the questioned evidence did not contribute to appellant's conviction.

We apply the rule as declared in *Chapman*. ■ For many years, in whatever terms it has been expressed, the courts of California have adhered to the principle that a conviction should not be affirmed if in the court's mind there was reason to believe that error in the trial may have adversely affected the substantial rights of the defendant.

■ We are convinced beyond a reasonable doubt that the evidence of the extrajudicial statements of the codefendants played no part in the conviction of appellant. The result of the trial which is most significant is that the jury refused to

exonerate any member of the group that committed the sensless attack upon Ruben Dominguez and the murder of Tommy Garcia. It was a duty well performed by a conscientious jury.

The judgment is affirmed.

Ford, P. J., and Cobey, J., concurred.

A petition for a rehearing was denied October 31, 1968, and appellant's petition for a hearing by the Supreme Court was denied December 11, 1968.