Galen Ray SANDERS *v.* STATE of Arkansas

CR 75-197 532 S.W. 2d 752

Opinion delivered February 23, 1976

*Don Langston,* for appellant.

*Jim Guy Tucker,* Atty. Gen., by: *James Guy Petty Jr.,* Dep. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Galen Ray Sanders was found guilty of assault with a deadly weapon after a jury trial on a charge of assault with intent to kill. He moved to quash his arrest and to suppress incriminating statements made by him to the police which he alleged to be the fruit of the arrest. The ground for the motion to quash the arrest was lack of probable cause for his arrest without a warrant. The ground for his motion to suppress his statements to police was basically the illegal arrest. We find that the arresting officers had probable cause and affirm the judgment.

Appellant was charged with having assaulted Ricky Banning, son of William L. Banning. Both were employed by Shipley Baking Company, the son having gone to work after some employees had gone on strike. They left work shortly before 8:30 p.m. The Bannings came out the back door of the bakery and got into the father's pickup truck on the parking lot at the bakery. The son was shot as they were leaving the parking lot. The father, who was driving, looked through the rear view mirror of his pickup truck, because he had heard a

noise which seemed to come from that direction, followed by three similar sounds in rapid succession. He saw three or four people standing around a vehicle which he recognized as one belonging to Sanders. The Bannings proceeded to the police station. Just before the father, who was driving, pulled into the driveway to the police station, they met the Sanders vehicle, a 1971 Chevrolet pickup truck with a white camper shell, which was travelling in the opposite direction at an abnormal speed for the area and came very close to the Bannings. The Bannings could not see who was driving. They proceeded into the station and the father told Detective Hill that his son had been shot, that he had seen the Sanders vehicle at the scene, that he had seen "people" standing around the vehicle, that he had met the Sanders vehicle en route to the police station and that whoever was driving came very close, either trying to get in front of the Banning vehicle or to see into it as it turned into the police station.

The Bannings then went to the hospital. The father returned to the police station after the son had seen a doctor. The son arrived at the police station 15 or 20 minutes later and they signed statements typed by Hill. Sanders was brought into the station while the Bannings were there. Sanders had been arrested by Detectives Sharp and Hill. As Hill was leaving the police station to go to Sanders' residence at about 9:40 p.m. he met Sharp. Hill had obtained Sanders' address from a computer. They proceeded to the trailer park where Sanders lived. After obtaining directions to the address they had, they found the Sanders vehicle about 25 feet from the gate at the entry to Sanders' house trailer. Hill saw it as soon as they arrived. Hill had questioned employees at the Shipley Baking Company at about 8:45 p.m. and verified the ownership of the truck Banning had described. When the officers knocked on the door, Sanders' wife answered and called Sanders, who came to the door after a slight delay. Hill asked him to come outside, saying that he and Sharp wanted to talk to him. Although there are some conflicts in the testimony about the exact sequence of events thereafter, Sanders was told that he was under arrest for investigation of assault with intent to kill. He asked the officers if they had a warrant and told them that he was not going with them unless they had a warrant. Sanders' wife was at the door hysterically hollering

that he didn't have to go if they didn't have a warrant, and that "the lawyer" had said so. Sanders was told by Hill that no warrant was necessary because they had probable cause for the arrest for a felony, but Sanders kept repeating that he was not going unless they had a warrant and that his attorney had told him that he was not required to do so. Detective Sharp undertook to explain to Sanders that he would be right if a misdemeanor was involved, but that a "felony case" was involved. After Sanders' continued refusal, the officers subdued him, handcuffed him and took him to the police station.

When they were all in the police automobile after the arrest, Sanders was advised of his constitutional rights by Hill. Some of the incriminating statements which Sanders claims should have been suppressed were spontaneous but one was in response to a question by Hill. Hill stated that when he left the police station, he intended to arrest Sanders, even though an inference could be drawn from Hill's testimony at the preliminary hearing that he formed that intention after Sanders came out of the trailer. Neither Sanders nor his wife testified at the suppression hearing and the testimony of Sharp and Hill stood uncontradicted.

On appeal, all presumptions are favorable to the trial court's ruling on the legality of the arrest, and the burden of demonstrating error rests upon appellant. *Williams* v. *State*, 258 Ark. 207, 523 S.W. 2d 377. When we indulge these presumptions, we cannot say that the trial judge erred. The police officers had authority to make a warrantless arrest if they had reasonable grounds to believe that Sanders had committed the felony of assault with intent to kill. *Williams* v. *State*, supra. When we consider the totality of the circumstances beginning with the sighting of Sanders' vehicle at the scene of the shooting to its being found at his residence within a reasonably short time span during which it had been "driven at" the Banning vehicle as it started to enter the driveway to the police station, we think there was sufficient evidence to sustain a finding of probable cause for the arrest.

It is to be remembered that probable cause is only a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man to

believe that the accused committed a felony, but not tantamount to the quantum of proof required to support a conviction. *Graves* v. *State*, 256 Ark. 117, 505 S.W. 2d 748. *Johnson* v. *State*, 249 Ark. 208, 458 S.W. 2d 409. The existence of probable cause depends upon the facts and circumstances of which the arresting officer has knowledge at the moment of the arrest. *Beck* v. *Ohio*, 379 U.S. 89, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964).

Determination of probable cause is based upon the factual and practical considerations of everyday life upon which reasonable and prudent men, not legal technicians, act. *Draper* v. *United States*, 358 U.S. 307, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959); *Brinegar* v. *United States*, 338 U.S. 160, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949). This practical, nontechnical concept has been said to afford the best compromise that has been found for accommodating competing interests, so that law enforcement will not be unduly hampered and law abiding citizens not left at the mercy of the whim and caprice of a police officer. *Beck* v. *Ohio*, supra; *Brinegar* v. *U.S.*, supra. In making this determination the reviewing court should follow a liberal rather than a strict course. *In re Watson's Petition*, 146 Mont. 125, 404 P. 2d 315 (1965).

To have probable cause for an arrest, it is not necessary that the arresting officer have the same type of specific evidence of each element of the offense as would be needed to support a conviction. *Adams* v. *Williams*, 407 U.S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972). A probability is not a certainty or a conclusion beyond a reasonable doubt. *Lathers* v. *United States*, 396 F. 2d 524 (5 Cir., 1968). The question of probable cause is a pragmatic one to be decided in the light of the circumstances of a particular case, which are reviewed, not as a legal scholar determines the existence of consideration in support of a promise, but as a man of reasonable prudence and caution would determine whether the person arrested has committed a felony. *People* v. *Harper*, 365 Mich. 494, 113 N.W. 2d 808 (1962). The answers cannot be found by the application of a mathematical formula. *Mattern* v. *State*, 500 P. 2d 228 (Alaska, 1972). See also, 5 Am. Jur. 2d 740, Arrest § 48. Constitutional standards permit common sense, honest judgments by police officers in their probable cause

determinations. *Lathers* v. *United States,* supra.

In the words of Circuit Judge (now Chief Justice) Burger, speaking for the District of Columbia Circuit Court of Appeals, probable cause for arrest is to be evaluated from the viewpoint of a prudent and cautious police officer at the time of the arrest, not from the remote vantage point of a library. *Jackson* v. *United States,* 302 F. 2d 194 (1962), quoted with approval, *Feguer* v. *United States,* 302 F. 2d 214 (8th Cir. 1962), cert. den. 371 U.S. 872, 83 S. Ct. 123; *Minnesota* v. *Cox,* 294 Minn. 252, 200 N.W. 2d 305 (1972).

When we view the facts in a common sense, pragmatic manner, we find sufficient evidence to support a finding of probable cause for this arrest.[1]

Although appellant's further argument on.this point is dependent upon the illegality of the arrest, there was sufficient evidence that the incriminating statements were not tainted by the arrest, even if it were illegal. Appellant relies on *Brown* v. *Illinois,* 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975), wherein it was held that the giving of the warnings prescribed by *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) did not, in and of itself, break the causal chain between an illegal arrest and subsequent inculpatory statements of the person arrested, so that the statements were admissible in evidence. The United States Supreme Court did not hold that the taint of the illegal arrest, followed by the giving of the Miranda warnings, reached any and every such statement made by the arrested person regardless of the circumstances. Rather, that court stated that it is entirely possible that persons arrested illegally frequently may decide to confess as an act of free will unaffected by the initial illegality, that the question of voluntariness must be answered in each case upon the particular facts of

---

[1]For other cases where probable cause for an arrest of an owner, occupant, or possessor of a motor vehicle was largely based upon recognition of the vehicle at the scene of a crime, see *People* v. *Thomas,* 33 Mich. App. 664, 190 N.W. 2d 250 (1971); *State* v. *Morsette,* 7 Wash. App. 783, 502 P. 2d 1234 (1972); *State* v. *Brown,* 261 Ia. 656, 155 N.W. 2d 416 (1968); *People* v. *Murphy,* 28 Mich. App. 150, 184 N.W. 2d 256 (1970); *People* v. *Wilson,* 16 A.D. 2d 207, 229 NYS Supp. 2d 685 (1962); *State* v. *Hamilton,* 264 N.C. 277, 141 S.E. 2d 506 (1965); cert. den. 384 U.S. 1020, 86 S. Ct. 1936, 16 L. Ed. 2d 1044.

the case, applying the standards of *Wong Sun* v. *United States,* 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). Those standards were quoted, viz:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959).

In *Brown* there was prolonged custodial interrogation and the record disclosed that the arrest was, in all probability, made for that purpose alone. There could be little doubt that the statements of Brown were the fruit of the poisonous tree and that the taint could hardly have been removed by the Miranda warnings. The situation here is decidedly different. After the arrest Sanders and the two officers got into the police car. Immediately thereafter, and apparently before anything else was said by anyone, Hill advised Sanders of his constitutional rights in detail and Sanders indicated that he understood. They travelled some distance before Sanders said anything. However, before the police station was reached and while Sanders was "laying back on the back seat just nonchalant-like," he spontaneously remarked, "A person sure can get in a lot of trouble when he's on strike" or "A man sure can get in a lot of trouble when he's on strike." To which Hill responded, "Yes you can, if there's a gun or shooting involved." Sanders then said, "I don't even own a .22." Although a .22 caliber bullet inflicted the wound suffered by young Banning, no mention had been made by the officers of the type of weapon involved. Subsequently, and apparently after arrival at the police station, Hill asked Sanders what he knew about the shooting and Sanders replied that he had not been involved in any way, but he knew who had done it, but that he had said enough and was not going to say any more until he talked to a lawyer.

Certainly *Brown* does not require that spontaneous,

voluntary statements of this nature be excluded. The really incriminating statements were made after a full explanation of Miranda rights and after Sanders had time for deliberation. The question asked at the police station followed those statements by Sanders, but no further question was asked when he indicated that he would have no more to say until he had consulted a lawyer. His remark substantiates the testimony that he understood his rights. Appellant has failed to demonstrate error in the admission of his statements into evidence on either ground argued by him.

Appellant also contends that the court erred in failing to give his requested instruction defining an accomplice and requiring the testimony of an accomplice to be corroborated. Even if we should find error in this respect, it would be harmless because the jury found Sanders guilty of assault with a deadly weapon, a misdemeanor. Corroboration of the testimony of an accomplice is not required for a misdemeanor conviction. See Ark. Stat. Ann. § 43-2116 (Repl. 1964).

Appellant asserted as a third point for reversal, the denial of his motions for a directed verdict. He concedes that there is no reversible error on this score, unless we sustain one of the points for reversal we have already treated.

The judgment is affirmed.