Robert Lee BURNETT *v.* STATE of Arkansas

CR 87-93                                    749 S.W.2d 308

Supreme Court of Arkansas
Opinion delivered May 9, 1988

*Sherman & James*, by: *Anthony J. Sherman*, for appellant.

*Steve Clark*, Att'y Gen., by: *Lee Taylor Franke*, Asst. Att'y Gen., for appellee.

DARRELL HICKMAN, Justice. This is a capital felony murder case. Robert Lee Burnett was convicted of murdering Rhonda Dobson, a clerk at the Super Stop in Brinkley, Arkansas. He received the death penalty. The victim was bludgeoned and stabbed repeatedly. The crime occurred in the early morning hours of July 10, 1986. We reverse the conviction because Burnett was unlawfully seized at his home in violation of the Fourth Amendment to the United States Constitution and evidence obtained as a result of that seizure was used against him.

A police officer drove by the Super Stop just after the crime occurred. He saw a black man run from the store but was unable to identify him; he searched but couldn't find him. Several people, who were traveling together in a truck which had stopped at the store, also witnessed the same man run from the store and jump a nearby fence. One of the people, Barbara Kuykendall, was taken to the police station, given a book of photographs, and asked if she could identify the man she saw. She testified at the pretrial suppression hearing that she could not identify the man. She said he was not included in the photographs. However, a police officer

testified Mrs. Kuykendall kept coming back to one picture and commenting there was a similarity between this photograph and the man she had seen. The photograph was one of Burnett, taken a few years earlier.

On this information alone, several police officers went to Burnett's house about 6 a.m., awakened him, and told him to come to the police station. One of the officers testified that Burnett was told Chief Storey wanted to talk to him. He was not arrested; but neither was he told he had any choice; he put on his trousers and accompanied the officers. When Burnett arrived at the station, he was promptly advised of his rights by Deputy Sheriff James Nolen. Nolen turned him over to Bill Gage, an investigator with the Arkansas State Police. Gage questioned Burnett, and Burnett denied killing anyone. However, Burnett did make a statement in which he admitted he had gone, in the early morning hours, to another store and to the Super Stop to obtain some mosquito repellant. He said he finally found the repellant at an Exxon station and returned home. This statement was made at 7:40 a.m.

About 10:30 a.m. a lineup was conducted. Barbara Kuykendall identified Burnett from the lineup. None of the participants had shirts on and two of them did not have shoes on. Burnett was not wearing shoes. There was evidence that the man running from the station did not have a shirt on, wore shorts or similar apparel, and wore no shoes.

About noon Burnett was turned over to an officer of the Arkansas State Police for a polygraph examination. The officer said he advised Burnett of his rights, conducted a polygraph examination, told Burnett he flunked the test, and he was lying about his participation in the murder. Burnett was again questioned by Officer Gage. This time a part of the interrogation was recorded. Burnett admitted he killed Rhonda Dobson. He said he had found a shotgun and a shaving kit and had gone to the store. "I took the shotgun up to the Super Stop. I went inside the Super Stop and sat the gun down just inside the door. I ask the girl who was working about the spray and she said, 'Nigger find it yourself or get out.' She was drinking pop or something and she threw it in my face. We got to fighting and that is the last thing I remember. I remember knocking her down." Burnett was arrested about 3:30

p.m. by Officer Gage after making a second incriminating statement.

A pretrial suppression hearing was held to determine if the statements and the identification should be excluded because of the unlawful arrest or seizure of Burnett at his home. The trial judge ruled that the officers had "probable cause to ask the defendant to come to the station, whether he was arrested or not." He found Burnett's rights had been protected and the statements and identification were valid. We agree with the appellant's argument that the trial court erred.

There is no doubt that the officers did not have probable cause to arrest Burnett for the crime when he was picked up. The only evidence they had was the information supplied by Kuykendall. She testified at the suppression hearing that Burnett was not in the photographs she was shown. An officer testified she kept "coming back" to Burnett's picture, but she did not identify Burnett from the photograph. Later during the trial Kuykendall elaborated on her testimony and said there was indeed a picture which looked like the man she had seen running from the store, but the man she had seen had a much thinner face.

The law is clear that a person cannot be arrested in his own house without a warrant absent exigent circumstances. *Payton* v. *New York*, 445 U.S. 573 (1980). If such an illegal arrest is made, any evidence obtained as a result of the arrest will be suppressed. *Wong Sun* v. *U.S.*, 371 U.S. 471 (1963). Also a person cannot be "seized" at his house without probable cause. Both acts are in violation of the Fourth Amendment to the United States Constitution. *See Dunaway* v. *New York*, 442 U.S. 200 (1979). The test for whether one has been seized was announced in *United States* v. *Mendenhall*, 446 U.S. 544 (1980), which provided:

> We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person

of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

In a case almost identical to the present case, the United States Supreme Court held there was a seizure. *Dunaway* v. *New York, supra.* A police sergeant, questioning a jail inmate about Dunaway, learned nothing that would warrant obtaining an arrest warrant. Nevertheless, he ordered other officers to "pick up" Dunaway and bring him in. Dunaway was taken into custody by three officers and, although he was not told he was under arrest, he would have been restrained if he had attempted to leave. He was given his *Miranda* rights, questioned and evidently made an incriminating statement. The court had little doubt that Dunaway was "seized." The state argued the detention did not amount to an arrest and was a permissible detention under *Terry* v. *Ohio*, 392 U.S. 1 (1968), because the police had a "reasonable suspicion" that Dunaway possessed "intimate knowledge about a serious and unsolved crime." The court rejected the argument:

> In contrast to the brief and narrowly circumscribed intrusions involved in those cases [*Terry* v. *Ohio, supra*, and similar decisions], the detention of petitioner was in important respects indistinguishable from a traditional arrest. Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was 'free to go'; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody. The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an 'arrest' under state law. The mere facts that petitioner was not told he was under arrest, was not 'booked,' and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes, [cite omitted] obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny. Indeed, any 'exception' that could cover a seizure as intrusive as that in this case would threaten to swallow the

general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause.

The central importance of the probable-cause requirement to the protection of a citizen's privacy afforded by the Fourth Amendment's guarantees cannot be compromised in this fashion. 'The requirement of probable cause has roots that are deep in our history.' [cite omitted]. Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment, and decisions immediately after its adoption affirmed that 'common rumor or report, suspicion, or even "strong reason to suspect" was not adequate to support a warrant for arrest.' [cite omitted] The familiar threshold standard of probable cause for Fourth Amendment seizures reflects the benefit of extensive experience accommodating the factors relevant to the 'reasonableness' requirement of the Fourth Amendment, and provides the relative simplicity and clarity necessary to the implementation of a workable rule.

The court concluded:

[D]etention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest. We accordingly hold that the Rochester police violated the Fourth and Fourteenth Amendments when, without probable cause, they seized petitioner and transported him to the police station for interrogation.

In *Hayes* v. *Florida*, 470 U.S. 811 (1985), the police went to the home of a principal suspect in a burglary and rape case. The officers spoke to him on his front porch. When he was reluctant to go to the station voluntarily, an officer said he would arrest him. The suspect "blurted out" he would rather go than be arrested. The suspect was taken to the police station without a warrant and fingerprinted. The court held that there was no probable cause to arrest the suspect, no consent to the journey to the police station, no prior judicial authorization for detainment, and the investigation and detention at the police station for fingerprinting violated

the Fourth Amendment. The fingerprints were suppressed as evidence. The court said:

> And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.

In the present case the trial judge did not rule the officers had probable cause. He ruled they had enough information to detain Burnett for investigative purposes. The appellant says seven officers picked him up; the state concedes four or five were present. The record reflects, by those officers who testified, that at least six policemen were present when Burnett was picked up. Burnett was not arrested; he was simply told to get his clothes on and come to the station. He was not told he could stay home. Although the officers were armed, there is no evidence, other than the appellant's testimony, that any of them held their weapons on Burnett.

Considering the totality of the circumstances, we conclude that Burnett was seized at his home in violation of the Fourth Amendment. The officers did not comply with our rules of criminal procedure, which require that an officer inform a person he is free not to accompany the officer if the officer does not have a warrant. *See* A.R.Cr.P. Rule 2.3. A reasonable person in Burnett's position would have thought that he had no choice except to accompany the officers to the police station. There is no real difference in this case and *Rose* v. *State*, 294 Ark. 279, 742 S.W.2d 901 (1988), where the defendant was picked up, detained and interrogated without probable cause.

The state argues that other independent evidence was discovered during the day which would provide the necessary probable cause. One officer testified that on the morning of the murder they found a trail of money from the Super Stop to Burnett's house. However, the evidence only showed that the trail was a few feet long leading in the general direction of Burnett's

house. About 10 a.m. that morning, a consent search of Burnett's residence was conducted and a sock was found in a garbage sack. Evidently it matched one found at the scene of the crime. (Officer Nolen testified that Burnett told him on August 13, 1986, that he had socks on his hands at the time of the robbery.)

An unusual development did take place during the trial about a piece of evidence. Two months after the crime, on September 11, 1986, Officer Nolen took a statement from Earnie Pye, which stated that Pye had seen Burnett leave the Super Stop just before Pye discovered the body. This evidence, if credible, undoubtedly, would have made the state's case; it would have given the state the probable cause it needed to arrest Burnett. But the state chose not to offer this evidence at the pretrial hearing nor during the trial. The same day this statement was taken by Nolen, Pye wrote a handwritten statement for the deputy prosecuting attorney denying the truth of the statement. Pye was in the county jail at the time, and he said Officer Nolen made him sign the statement by threatening him with more time for his offense. At the pretrial hearing held on January 5, 1987, the state did not ask Officer Nolen about this information. In fact the deputy prosecuting attorney indicated to Nolen at one point not to repeat any hearsay he may have obtained from Pye.

The defense called Officer Nolen as a hostile defense witness, and Nolen testified that Pye told him early that morning before Burnett was picked up that the man leaving the station looked like Burnett. The September statement given to Nolen and the letter from Pye to the deputy prosecuting attorney were offered to impeach Officer Nolen and to show a witness was coerced to say something he did not want to say, and to show there was a pattern that the state was trying to "prove up more of a case than they had at the time." The defense called an auxillary police officer who testified that he was asked to go to the Exxon station and review surveillance tapes from a camera to see if Pye was on the tape. He could not recall if he was asked to view the tapes on July 10 or July 11.

The officer, immediately on the scene, related that Pye and another person came up after the man had run from the Super Stop and that Pye could not have seen the man exit the station.

The state in this case simply failed to prove that the seizure

410

without a warrant was with probable cause and that the detention was lawful under the Fourteenth Amendment. Evidence accumulated during the day did not bolster the state's case nor alter the fact that it had no probable cause to seize, detain, and interrogate Burnett.

██ We hold the statements and lineup identification were taken in violation of the Fourth and Fourteenth Amendments of the United States Constitution and must be suppressed. *Hayes* v. *Florida, supra.*

██ The lineup was not suggestive in our judgment although Burnett, who is 5'4", was shorter than any of the other participants. Kuykendall did not say the man was short. She said the man jumping the fence was about the height of her husband who is 5'11". This discrepancy would go to the weight of her testimony, not the correctness of the lineup. Sergeant Gage testified that the participants were sitting and that he had them stand one at a time so the difference in height would not be noticeable. But Kuykendall testified that the participants were all standing when she saw the lineup. Burnett testified that all the participants were standing the first time they were viewed for identification and that the second time they were all sitting and stood one at a time. Kuykendall testified that the reason she recognized Burnett was because of his slim, pointed face. While the lineup itself was not suggestive, it was the result of the illegal seizure of Burnett and the lineup identification cannot be used as evidence against him. *Hayes* v. *Florida, supra.*

██ That does not mean the in-court identification by Kuykendall is automatically excluded.

██ The United States Supreme Court has defined the standard for admitting an in-court identification after an illegal arrest. In *United States* v. *Wade*, 388 U.S. 218 (1967), the court held that the admissibility of an in-court identification requires consideration of various factors:

> [T]he prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the

lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification.

In *United States* v. *Crews*, 445 U.S. 463 (1980), the witness viewed photographs at the police station and later made an in-court identification. The court said:

A victim's in-court identification of the accused has three distinct elements. First, the victim is present at trial to testify as to what transpired between her and the offender, and to identify the defendant as the culprit. Second, the victim possesses knowledge of and the ability to reconstruct the prior criminal occurrence and to identify the defendant from her observations of him at the time of the crime. And third, the defendant is also physically present in the courtroom, so that the victim can observe him and compare his appearance to that of the offender.

We cannot conclude from this record whether the in-court identification should be suppressed. The question addressed at the trial was whether the lineup was proper—not whether Kuykendall's in-court identification was tainted by the illegal arrest and detention. On remand the court will conduct a pretrial hearing to determine whether the in-court identification was tainted by the illegal seizure. *See Wright* v. *State*, 258 Ark. 652, 528 S.W.2d 905 (1975).

We now address the other issues which may arise again at a retrial. Objection was made to the admissibility of the photographs. We have repeatedly held that photographs, even though inflammatory, are admissible to illustrate the savagery of the attack, prove an element of the offense or assist the jury in understanding the testimony. *Parker* v. *State*, 292 Ark. 421, 731 S.W.2d 756 (1987). We find no abuse of discretion in this case.

It is argued that Arkansas' capital murder law does not require an intent to kill and is unconstitutional. We have held "[t]he working of the statute, i.e., conduct manifesting extreme indifference to human life, indicates that the perpetrator of capital murder must act with deliberate conduct which culminates in the death of some person." *Pruett* v. *State*, 287 Ark. 124, 697 S.W.2d 872 (1985). We find the constitutional require-

ments are satisfied. *See Tison* v. *Arizona*, ___ U.S. ___, 107 S. Ct. 1676 (1987).

 The argument is made it is unconstitutional to seek the death penalty when a black defendant is tried for the murder of a white victim. This argument was rejected in *McCleskey* v. *Kemp*, ___ U.S. ___, 107 S. Ct. 3199 (1987).

Appellant also argues that Arkansas' capital felony murder statute amounts to a mandatory death sentence because the jury cannot show mercy regardless of its findings. This argument was rejected in *Hill* v. *State*, 289 Ark. 387, 713 S.W.2d 233 (1987).

Reversed and remanded.