Michael Dale BOWDEN *v.* STATE of Arkansas

CR 88-46 761 S.W.2d 148

Supreme Court of Arkansas
Opinion delivered December 5, 1988

162

*Gardner, Putman & Miner*, by: *Buford Gardner* and *John Putman*, for appellant.

*Steve Clark*, Att'y Gen., by: *Theodore Holder*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. The appellant, Michael Dale Bowden, was convicted of capital murder and sentenced to life

imprisonment without parole. For reversal, he argues that the trial court erred in (1) admitting identification testimony into evidence; (2) finding there was probable cause for arrest; (3) ruling that a child witness was competent to testify; (4) refusing to allow the defense to play a tape to question the credibility of a child witness; (5) allowing testimony from an expert witness regarding an experiment he conducted; and (6) admitting into evidence testimony regarding statements not furnished in discovery. Inasmuch as the court erred in two respects, we reverse and remand for a new trial.

At 1:55 a.m. on April 19, 1987, Gary Keeter, a Harrison police officer, went to the home of Johnny Hefley in response to a call that there was a disturbance there. Upon the officer's arrival, a man from across the street told him that he had "a little boy over at his home who says his mom and dad is bleeding." Upon entering Hefley's residence, Keeter saw the bleeding bodies of Johnny Hefley and Cindy Bowden, Hefley's former wife. In addition, Keeter saw a number of nine millimeter shell casings lying on the floor.

Other officers arrived on the scene a few minutes later. According to Officer Glen Redding, the police were able to make the following factual observations at this point: (1) the victims were shot to death; (2) neither victim appeared to be armed; (3) there was no forced entry into the residence; (4) in light of the location of the bodies (Hefley's was slumped over in a chair; Bowden's was on the floor beside Hefley's.), what they were wearing, and the fact that there were no signs of forced entry, Hefley and Bowden apparently knew their murderer.

Upon being advised that Hefley's and Bowden's five-year-old son, John David Hefley, was across the street at a neighbor's residence, Officer David Cone spoke with him. John David told the officer that he had been in his bedroom and heard what he thought was a fight between his mother and father and that he got out of bed, walked into the living room, and found his mother and dad lying on the floor. The officer then asked him if anyone else had been there that night. John David replied, "Michael Bowden from Texas."

Officers at the scene also talked with Michael James, who lived two houses down from the Hefleys' home. According to

James, as he was driving up to his house earlier that night around 1:30 a.m., he noticed a late 70's dark blue Ford pickup truck parked on the street in front of the Hefleys' home. A few minutes later, while he was at his home, James heard a loud metallic banging noise and a female voice "trying to get them to stop." In all, he heard seven or eight of these noises. Immediately thereafter, he heard a car door slam and gravel spin out from under the tires. He then looked out of his window and saw the pickup which had been parked in front of the Hefleys' residence leaving the scene rapidly. As the truck turned the corner, he heard something sliding across its bed.

After learning that Michael Bowden had been in the house that night, the police immediately attempted to gain information about him. Relatives of Cindy Bowden informed the police that Michael Bowden was Cindy Bowden's husband and that two weeks prior to the murders, she had left him in Waxahachie, Texas, where they were living, and returned to Harrison to live with her former husband, Johnny Hefley.

Carl Bowden, Michael's brother, informed the police that Michael was driving Carl's tan or cream-colored 1979 Ford pickup truck and that the bed of the truck contained plastic milk crates.

Christine Franz, Michael and Cindy Bowden's daughter, informed police that Michael had contacted her twice on April 18, 1987, in an attempt to contact Cindy Bowden. In addition, the police talked to Cindy's mother, who told them that Cindy was afraid of Michael because he had recently found out that Cindy was living with Johnny Hefley.

At 9:00 a.m. on April 19, Rondall Campbell told police that seven days prior to the murders, while he was at Hefley's residence, Cindy Bowden had a telephone conversation with Michael Bowden's sister, Kathleen Bowden Harless. According to Campbell, Harless told Cindy that Michael was suicidal. In addition, he told police that Cindy informed him that she believed Harless had made threatening calls to her the day before.

In talking with the Waxahachie, Texas, police, the Harrison police learned that Michael Bowden previously had been convicted of a homicide that involved the breakup of a marriage.

On April 19, 1987, the Waxahachie police issued a warrant for Michael Bowden's arrest, and at approximately 1:30 p.m., they arrested him at Carl Bowden's home in Waxahachie.

On April 22, the police brought Bowden back to Arkansas. Upon arrival at the Harrison police station, he invoked his right to counsel.

On April 23, 1987, an information was filed against Bowden. On the same day, police officers, in attempt to obtain additional evidence that Bowden had been in Arkansas on the night of the murders, showed two pictures of Bowden to Joe Williams, an attendant at a service station in Conway, Arkansas, and asked him if he had seen the individual in the pictures. Williams replied that he had not. The police then showed him a driver's license picture of Bowden depicting him with glasses. Williams told police he had seen the individual in the picture on April 19 between 2:00 and 3:00 a.m. Williams also told police that Bowden was driving an older light colored truck and gave the police a detailed description of him.

On April 24, Bowden was arraigned. Public Defender John Nichols appeared at the arraignment as Bowden's counsel.

On the morning of April 27, the police advised Bowden that a lineup would be conducted later in the day. According to Officer Glen Redding, he asked Bowden if he had an attorney he would like to contact prior to the lineup, and Bowden advised him that he or his brother had been in contact with Buford Gardner and that he anticipated Mr. Gardner being hired as his attorney. In addition, Redding informed Bowden that John Nichols would be present at the lineup.

Redding then transported Bowden from the sheriff's office to the police department, where the lineup was to be held. Upon arrival at the police station, Redding contacted both Nichols and Gardner. Gardner stated he did not represent Bowden and would not attend the lineup. Nichols indicated he did not believe he could represent Bowden because of his lack of experience. According to Redding, he then informed Bowden that neither would be present, and Bowden did not thereafter request an attorney.

Bowden's account is somewhat different. According to

Bowden, Redding told him that he had the right to an attorney at the lineup but never asked him if he wanted an attorney present. In addition, Bowden asserts that after they arrived at the police station, Redding told him that John Nichols was on the way over and just before the lineup, Redding told him that Nichols was there.

The lineup was then held without counsel being present, and Joe Williams positively identified Bowden as the man he saw at the service station on the night of the murders.

## I. *IDENTIFICATION TESTIMONY.*

Bowden argues that the trial court erred (1) in admitting into evidence testimony by Joe Williams that he identified Bowden in the lineup in that the lineup was conducted without counsel present and (2) in allowing identification testimony at trial by Williams that during the early morning hours of April 19, 1987, Michael Bowden stopped at a service station in Conway where Williams was working in that this evidence was tainted by the illegal lineup procedure. We conclude that the trial court erred in allowing Williams' testimony regarding the lineup and reverse and remand for a new trial.

Bowden clearly had the right to counsel at the post-information lineup absent a knowing and intelligent waiver. *United States* v. *Wade*, 388 U.S. 218 (1967); *Loane* v. *State*, 271 Ark. 797, 611 S.W.2d 190 (1981); *Jackson* v. *State*, 249 Ark. 653, 460 S.W.2d 319 (1970). The burden is upon the State to show that an accused's waiver of his constitutional right to counsel at a lineup was given voluntarily, knowingly, and intelligently. *Loane, supra.* The determination of whether there has been an intelligent waiver of right to counsel depends upon the particular facts and circumstances of the case, including the background, experience and conduct of the accused. *Johnson* v. *Zerbst*, 304 U.S. 458 (1930). A trial court's ruling on waiver of counsel will not be set aside unless clearly erroneous. *Loane, supra.*

We conclude from the facts and circumstances before us that Bowden did not knowingly relinquish or abandon his right to counsel at the lineup. There was testimony by Redding that after he informed Bowden that counsel would not be present,

Bowden did not request an attorney. However, he was not asked if he chose to proceed [See *Loane, supra*], but simply placed in the lineup. In sum, the State did not meet its burden of showing an intelligent and voluntary waiver by Bowden of his right to counsel.

The presence of counsel at a lineup serves not only to allow an informed challenge to be made to identification testimony at trial in order to diminish the weight given to it by the jury, but also to minimize the likelihood of an unduly suggestive confrontation. *Wade, supra; United States* v. *Allen*, 408 F.2d 1287 (D.C. 1969). As *Wade* recognizes, "[t]he trial which may determine the accused's fate may well not be in the courtroom but that at the pretrial confrontation, with the State aligned against the accused, the witness the sole jury, and the accused unprotected against the overreaching, intentional or unintentional, and with little or no effective appeal from the judgment there rendered by the witness—'that's the man.' "

Since the police denied Bowden his sixth amendment right to counsel at the lineup, any testimony concerning the lineup identification by Joe Williams was, therefore, inadmissible at trial. *Gilbert* v. *California*, 388 U.S. 263 (1967). *See Wade, supra*. Because the trial court allowed his testimony, we reverse on this point.

Since we are remanding this case, we will address the issue of the admissibility of the in-court identification testimony of Joe Williams, as well as other issues which are likely to arise on retrial.

We first note that ordinarily we would remand this case to the trial court so that it could conduct a pretrial hearing to determine whether the in-court identification was tainted by the improper lineup identification. *Burnett* v. *State*, 295 Ark. 401, 411, 749 S.W.2d 308 (1988). *See also Wright* v. *State*, 258 Ark. 651, 528 S.W.2d 905 (1975). However, this procedure is not required (1) when we can ascertain from the record whether the in-court identification was tainted and therefore should be suppressed or (2) when the trial court considered this issue. *See Burnett, supra. See also Mayes* v. *State*, 264 Ark. 283, 571 S.W.2d 420 (1978).

■ Under the circumstances, we find it unnecessary to remand to the trial court for this determination in that (1) the trial court ruled that the in-court identification was based upon Joe Williams' independent recollection, not upon the previous lineup and (2) we can ascertain from the record whether the in-court identification was tainted by the lineup identification.

■ We do not reverse a trial court's ruling on the admissibility of an in-court identification unless, under the totality of circumstances, it is clearly erroneous. *Banks* v. *State*, 283 Ark. 284, 676 S.W.2d 459 (1984); *Kellensworth* v. *State*, 278 Ark. 261, 644 S.W.2d 933 (1983).

■ Notwithstanding the fact that counsel was improperly denied at a lineup, a witness who identified the accused at the lineup may identify the accused at trial provided the prosecution can establish by clear and convincing evidence that the in-court identification was based upon independent observations of the suspect rather than on the constitutionally infirm lineup identification. *Wade, supra. See Perry* v. *State*, 277 Ark. 357, 642 S.W.2d 865 (1982); *Montgomery* v. *State*, 251 Ark. 645, 473 S.W.2d 885 (1971).

■ Reliability is the linchpin in determining the admissibility of identification testimony. *Manson* v. *Brathwaite*, 432 U.S. 98 (1977); *Banks, supra; Whitt* v. *State*, 281 Ark. 466, 664 S.W.2d 876 (1984). *See also Maulding* v. *State*, 296 Ark. 328, 757 S.W.2d 916 (1988). In determining reliability, we examine the following factors: (1) the prior opportunity of the witness to observe the alleged act, (2) the accuracy of the prior description of the accused, (3) any identification of another person prior to the lineup, (4) the level of certainty demonstrated at the confrontation, (5) the failure of the witness to identify the defendant on a prior occasion, and (6) the lapse of time between the alleged act and the lineup identification. *Wade, supra; Manson, supra; Maulding, supra; Banks, supra.*

We turn, then, to the facts of this case and apply the applicable analysis:

> 1. Opportunity to observe. When Bowden was paying for gas, he talked with Williams for a few minutes and then stood beside the station door for a couple of minutes.

2. Accuracy of description. Bowden's pre-lineup description was extremely accurate and included Bowden's height, weight, hair, and the fact he wore glasses.

3. Identification of another person. Williams did not identify any other person prior to the lineup.

4. Level of certainty. Williams was positive in his identification of Bowden.

5. Failure to identify. There was no failure to identify on an occasion prior to the lineup.

6. Time between the alleged act and the lineup identification. Approximately eight days elapsed between the time that Williams observed Bowden and the lineup identification.

In examining the totality of the circumstances, we cannot say that the trial court's admission of the in-court identification was clearly erroneous. The evidence is clear and convincing that the in-court identification was based on observations independent of the lineup identification. *Wade, supra.*

## II. *OTHER ISSUES ON REMAND.*

### A. ADMISSIBILITY OF THE FRUIT OF BOWDEN'S ARREST.

Bowden contends that the trial court erred in finding there was probable cause to arrest him and therefore in admitting into evidence tainted fruit of the illegal arrest: custodial statements he made to police; photographs of him that were obtained at the time of arrest; fingerprint samples; and the in-court identification by Joe Williams. We disagree.

Probable cause exists where there is a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man to believe that a crime has been committed by the person suspected. *Hines v. State*, 289 Ark. 50, 709 S.W.2d 65 (1986). Probable cause to arrest does not require the quantum of proof sufficient to sustain a conviction. *Burks v. State*, 293 Ark. 374, 738 S.W.2d 399 (1987). Determination of probable cause is said to be based upon factual and practical considerations of everyday life upon which ordinary

men, not legal technicians, act. *Hines, supra.* A non-technical approach correctly balances the competing interests of the individual and society, so that law enforcement officers will not be unduly hampered, nor law abiding citizens left to the mercy of overzealous police officers. *Id.* In making the determination of probable cause, we are liberal rather than strict, *Sanders* v. *State*, 259 Ark. 329, 532 S.W.2d 752 (1976), and the appellant has the burden of demonstrating that the trial court's finding that the arrest was legal is incorrect. *Munnerlyn* v. *State*, 292 Ark. 467, 730 S.W.2d 895 (1987).

The Harrison police knew the following facts prior to arresting Bowden:

(1) The circumstances surrounding the victims' homicides indicated that they knew their murderer.

(2) According to John David Hefley, Michael Bowden was at the Hefleys' residence on the night of the murders.

(3) According to Carl Bowden, on the night of the murders, Michael was driving Carl Bowden's 1979 Ford pickup, the bed of which contained milk crates.

(4) On the night of the murders, a neighbor, Michael James, spotted a late 70's Ford pickup parked in front of the Hefleys' residence. A short time later, he heard some loud banging noises and a female voice "trying to get them to stop." The pickup then sped away. As it turned the corner, James heard something sliding around in the bed of the truck.

(5) Christine Franz related information that Michael Bowden tried to contact Cindy Bowden on the day of the murders.

(6) Cindy Bowden's mother claimed Cindy was afraid of Michael Bowden because he had recently found out Cindy was living with Johnny Hefley.

(7) According to Rondall Campbell, Cindy Bowden told him she believed that Michael Bowden's sister had made threatening calls to her seven or eight days prior to the homicides.

(8) Michael Bowden previously had been convicted of a homicide that involved the breakup of a marriage.

We conclude that these facts and circumstances are sufficient to establish probable cause to arrest Bowden. Therefore, the trial court did not err in admitting the fruit of the arrest.

## B. COMPETENCY OF A CHILD WITNESS.

Bowden argues that the trial court erred in ruling that John David Hefley was competent to testify. We disagree.

The guidelines established by this court with respect to competency of a witness enunciated in *Jackson v. State*, 290 Ark. 375, 720 S.W.2d 282 (1986), are:

> [t]he ability to understand the obligation of an oath and to comprehend the obligation imposed by it; an understanding of the consequences of false swearing; and the ability to receive accurate impressions and to retain them, to the extent that the capacity exists to transmit to the fact finder a reasonable statement of what was seen, felt or heard [quoting *Chambers v. State*, 275 Ark. 177, 628 S.W.2d 306 (1982)].

"As long as the record is one upon which the trial judge could find a moral awareness of the obligation to tell the truth and an ability to observe, remember and relate facts, we will not hold that there has been a manifest abuse of discretion in allowing the testimony." *Jackson, supra; Hoggard v. State*, 277 Ark. 117, 640 S.W.2d 102 (1982), *cert. denied*, 460 U.S. 1022 (1983).

John David's testimony at the competency hearing was not a model of lucidity. It contained inconsistencies, non-verbal responses, and long pauses. As to the obligation of the oath and the consequences of false swearing, he indicated (1) that he knew how important it was to tell the truth and he could do so if called upon to testify again; (2) that he might get into trouble or go to jail if he did not tell the truth or if he lied; and (3) that the truth is telling just what he knew or just what he saw and not making up a story.

In addition, throughout his testimony he showed an ability to recall and give accurate impressions of reality. He knew that his

parents died at his house, that his Easter basket contained a football, and that he lived with Michael Bowden in Texas.

■ Giving due regard to the trial court's superior ability to observe John David Hefley testify, we conclude that it did not abuse its wide discretion in ruling John David was competent to testify.

## C. ADMISSIBILITY OF A TAPE RECORDING.

Bowden argues that the trial court erred in not allowing the defense to introduce into evidence a tape recording of the competency hearing to show that John David Hefley was coached between the hearing and the trial. We hold to the contrary since Hefley admitted that he had been coached.

■■ The extent of coaching of a witness is a relevant inquiry to test the credibility of a witness. *See Geder* v. *United States*, 425 U.S. 80, 89 (1976). That a witness had been coached is a fact that may indicate bias. John E.B. Myers, *Child Witness Law and Practice*, § 4.57 (1987). The bias of a witness is not a collateral matter, and extrinsic evidence is admissible thereon. *Kellensworth* v. *State*, 275 Ark. 252, 631 S.W.2d 1 (1982). If a witness denies or does not fully admit the facts claimed to show bias, the attacker has a right to prove these facts by extrinsic evidence. *McCormick Handbook of the Law of Evidence*, § 40 (3rd ed. 1984).

John David Hefley's testimony at the competency hearing differed from that at trial. The defense established on cross-examination that he practiced with or was coached by the prosecutor between the competency hearing and trial. Subsequently, defense counsel asked the court to allow him to play the tape of John David's testimony at the competency hearing for the jury to show that he was coached. The trial court denied this request.

■ Inasmuch as John David admitted he was coached by the prosecution, it was within the trial court's wide discretion to decide whether the defense could introduce extrinsic evidence to show the extent of bias. We find no abuse of discretion.

## D. TESTIMONY REGARDING EXPERIMENT.

Bowden contends that the trial court erred for three reasons in allowing the testimony from an expert witness for the State, Mike Vowell, regarding a photographic experiment he conducted: (1) Vowell's testimony as an expert witness invaded the province of the jury; (2) the prosecution did not lay a proper foundation that he was qualified to testify in the area of lighting; and (3) the prosecution did not lay a proper foundation for the introduction of evidence concerning the experiment because it did not show that the experiment as conducted under substantially identical conditions and circumstances to those existing in the case. We hold to the contrary.

At trial, the State called Michael James who testified, among other things, that as he was returning to his home on the morning of April 19, 1987, he saw a late 70's Ford parked in front of the Hefleys' residence. When asked on direct examination his recollection of the description of the pickup truck, he stated:

> Well, it was dark on the street. They don't have a street light or didn't at that time have a street light on that corner. As I came up around Tammy's car, I saw it straight head-on, you know, by the grill and everything. It was a late 70's Ford. I could tell you that, you know, by the grill and everything. I used to have a Ford. As I went beside it, I had the distinct impression it was dark blue. . . .

Mr. James also testified that shortly after arriving at the home, he heard seven or eight metallic banging noises. He then heard a vehicle door slam and looked out of his window and saw the pickup truck speeding away.

At trial, it was established that Michael Bowden was driving a tan or cream-colored 1979 Ford pickup on the night of the murders.

The State then called Vowell, a photographer with the Arkansas Crime Lab, as its next witness. Prior to Vowell's testimony, the prosecution advised the court:

> At my request he went up the scene of the crime and he photographed the crime scene under lighting situations that existed on the night of April 19. It will reflect how a

truck would appear on that darkened street under those circumstances.

Vowell first testified (1) that he has been the chief photographer with the Arkansas Crime Laboratory since 1982 and that he does microscopic, infra red, and ultra violet work; (2) that he was trained in surveillance photography from 1970 to 1980; and (3) that he owned a photographic studio for three years.

Defense counsel objected at this point on the grounds that the State had failed to lay a proper foundation that Vowell was qualified to testify in the area of lighting. The court overruled the objection. Thereafter, Vowell testified (1) that his assignment was to photograph a vehicle in low light conditions at night; (2) that he obtained a light colored Ford pickup and a light yellow piece of metal approximately three feet by two feet; and (3) that he photographed these items in front of the Hefleys' residence at night using only the available street light.

Next, the prosecution asked Vowell to identify three photographs he took of the truck. Defense counsel objected on the basis that the State had failed to lay a proper foundation that the experiment was conducted under the same circumstances that existed on the night of April 19. The trial court overruled the objection.

Vowell then testified (1) that the color of the truck he photographed and the color of the truck driven by Michael Bowden were slightly different; (2) that he took the photographs on the street where the officers told him that Bowden's vehicle had been seen; and (3) that he took the photographs at about 10:00 o'clock at night under heavy overcast skies with one street light approximately one block away.

After Vowell described the photographs, the prosecution introduced them into evidence over defense counsel's objection. Thereafter, Vowell testified (1) that the photographs were a fair and accurate representation of the scene as it appeared on that night and (2) that if headlights hit the vehicle head on, it would appear to be the true color of the vehicle.

Finally, on cross-examination, he testified (1) that he was forty feet away from the pickup truck when he photographed it, (2) that he did not know exactly where the truck was located on

the night of the murder, and (3) that he did not photograph the truck under headlights.

Bowden first argues that the trial court erred in allowing Vowell to testify as an expert because his testimony invaded the province of the jury. We disagree.

The general test for admissibility of expert testimony is whether the testimony will aid the trier of fact in understanding the evidence or determining a fact issue. *Harris* v. *State*, 295 Ark. 456, 748 S.W.2d 666 (1988). An important consideration in determining whether the testimony will aid the trier of fact is whether the situation is beyond the trier of fact's ability to understand and draw its own conclusions. *Id. See Johnson* v. *State*, 292 Ark. 632, 732 S.W.2d 817 (1987).

Since the average juror would not know the effect low lighting produces on a tan truck, Vowell's testimony thereon aided the jury in understanding this question. Therefore, Vowell's testimony did not invade the province of the jury and was admissible.

Bowden also argues that the trial court erred in allowing Vowell to testify because he was not properly qualified to testify as an expert in the area of lighting. We again disagree.

The determination of the qualifications of an expert witness lies within the sound discretion of the trial court, and his decision will not be reversed absent an abuse of discretion. *Cathey* v. *Williams*, 290 Ark. 189, 718 S.W.2d 98 (1986). *Robinson* v. *State*, 274 Ark. 312, 624 S.W.2d 435 (1981). The standard for measuring the qualifications of an expert witness is flexible, and if some reasonable basis exists from which it can be said that the witness has knowledge of the subject beyond that of persons of ordinary knowledge, his testimony is admissible. *Dildine* v. *Clark Equipment Co.*, 282 Ark. 130, 666 S.W.2d 692 (1984).

Vowell's testimony concerning his extensive experience in photography was sufficient to qualify him as an expert in the area of lighting. As a photographer, his knowledge of lighting is markedly beyond that of an ordinary person. We find no abuse in discretion.

Finally, Bowden argues that the trial court erred in allowing testimony regarding the experiment and photographs of it in that prosecution did not show that Vowell conducted the experiment under substantially identical conditions and circumstances to those existing in the case. We hold to the contrary.

 The admissibility of demonstrative evidence is in the wide discretion of the trial judge. *Rasmussen* v. *State*, 277 Ark. 238, 641 S.W.2d 699 (1982). When a test or experiment is an attempt to reenact the original happening, the essential elements of the experiment must be substantially similar to those existing at the time of the original occurrence. *Carr* v. *Suzuki Motor Co.*, 280 Ark. 1, 655 S.W.2d 364 (1983).

 Vowell did not take the photographs in question in exactly the same conditions as on the night of the murder. For one thing, the photographs were not taken with headlights shining on to the truck. However, substantial similarity is all that is required.

Vowell took the photographs of the truck at essentially the same location, the same time, and under the same lighting conditions as that on the night of the murder. Under the circumstances, we find that the trial court did not abuse its discretion in admitting into evidence testimony regarding this experiment or the photographs of it.

## E. STATEMENTS NOT FURNISHED IN DISCOVERY.

We agree with Bowden that the trial court erred in allowing testimony regarding statements not furnished in discovery.

On May 4, 1987, almost four months prior to trial, Bowden filed a motion for discovery in which he requested, among other things, that the prosecuting attorney disclose "any written or recorded statements and the entire substance of any oral statements made by the defendant." On June 26, 1987, the State filed its response listing only statements made to law enforcement officers. Subsequently, Bowden's counsel made oral requests for the disclosure of statements allegedly made by Bowden.

At trial the State called Shirley Duncan, Cindy Bowden's mother, to testify concerning the substance of a telephone conversation she had with Michael Bowden prior to the murders. The following exchange then took place:

PROSECUTOR: Now, during that period of time, did you hear from Michael?

MS. DUNCAN: I heard from Michael; he called me.

PROSECUTOR: What was his call? What did he say?

MS. DUNCAN: He said, I brought your babies back. I said, I know.

PROSECUTOR: And then what did he say?

MS. DUNCAN: We talked. He wanted to know if I knew why Cindy came home. I told him I didn't know, that I had tried to get her to stay and she wouldn't.

PROSECUTOR: When you said you didn't know, was that the truth?

MS. DUNCAN: No, it wasn't the truth.

At this point, defendant's counsel objected, and the following discussion occurred at the bench:

MR. GARDNER [defense counsel]: Your honor, I object at this point to any conversation that the witness had with Michael Bowden if she intends to relate testimony regarding statements made by Michael Bowden. I requested from the prosecuting attorney all statements he had or the substance thereof and we have not been furnished with any of this.

PROSECUTOR: The law requires that we furnish statements taken from law enforcement. Furthermore, Mr. Gardner had been furnished this. I furnished him a copy of this lady's statement as regards this telephone call.

MR. GARDNER: Your Honor, the prosecuting attorney did furnish me with that transcribed copy of the statement taken from Shirley and the only reference I can find in there to any conversation she had with Michael, he said on the phone, "I brought your babies home to you." That is the only statement.

PROSECUTOR: I submit, Your Honor, we have fully complied with the rules of discovery, if there's any grounds for objection.

THE COURT: Objection will be overruled.

MR. GARDNER: Note our exception.

The examination of Ms. Duncan regarding the telephone conversation continued as follows:

PROSECUTOR: Now, what did he say? You know, he was asking you for information about why Cindy had left him or come back to Harrison?

MS. DUNCAN: He did.

PROSECUTOR: Now, in addition to that, did he tell you anything about Cindy or about their relationship?

MS. DUNCAN: He gave me a message to give to Cindy.

PROSECUTOR: What was the message?

MS. DUNCAN: He said, well, she's in Arkansas, Harrison, Arkansas, and I'm in Texas and we're still married. I intend to conduct myself as a married man and I expect her to conduct herself as if she's married.

PROSECUTOR: How did he say that?

MS. DUNCAN: Emphatic; it was to the point.

The next witness called to testify for the State was Steve Duncan, Cindy Bowden's father. Defense counsel objected to Duncan's testifying as to any statements made by Bowden to Duncan not furnished in discovery. The trial court denied this objection, essentially finding the State did not have a duty to disclose statements by an accused to private citizens. Mr. Duncan then testified that prior to the murders, Michael Bowden told him that he had an eight or nine millimeter automatic pistol with a left handed ejection. His testimony was also crucial inasmuch as nine millimeter shell casings were found at the scene of the crime.

█ Rule 17.1(a)(ii) provides as follows: "the prosecuting attorney shall disclose to defense counsel, upon timely request, . . . any written or recorded statements and the substance of any oral statements made by the defendant or a co-defendant." The plain language of this Rule does not limit the discovery obligation of the State solely to statements made to the police or other authorities. To the contrary, it provides that upon timely request,

the prosecution must disclose any written or recorded statement and the substance of any oral statement made by the defendant. Our cases are in accord. *See Bennett* v. *State*, 297 Ark. 115, 759 S.W.2d 799 (1988). *Parker* v. *State*, 292 Ark. 421, 432, 731 S.W.2d 756 (1987).

The State clearly breached its duty to provide statements made by Bowden to the Duncans. On remand we direct the State to strictly comply with all discovery obligations.

Reversed and remanded.

HAYS, J., dissents.

STEELE HAYS, Justice, dissenting. I disagree with the majority that the appellant has demonstrated error in the trial proceedings that requires reversal of this conviction. The majority concludes that "since the police denied Bowden his Sixth Amendment right to counsel at the lineup, any testimony concerning the lineup identification by Joe Williams was, therefore, inadmissible at trial," citing *United States* v. *Wade*, 388 U.S. 218 (1967) and *Gilbert* v. *California*, 388 U.S. 23 (1967). But it is undisputed that the police told appellant that he had a right to have counsel present and they even exerted considerable efforts of their own to obtain counsel, contacting both the public defender (who represented appellant at arraignment), and twice contacting counsel who represented appellant at trial, all to no avail. Moreover, at no time did appellant invoke his right to be represented at the lineup by requesting counsel or by objecting to a lineup being conducted.

The majority is holding that on remand Joe Williams can identify the appellant as the man he saw in his service station in Conway, Arkansas, in the early morning hours after the murders of Cindy Bowden and John Hefly, but he may not testify to having identified him in a lineup. I respectfully suggest that the majority is drawing a distinction that makes little sense. I do not propose that on remand the witness should be permitted to testify that he identified the appellant from a lineup. That, I believe, is of little moment either way. What is important is whether the witness can point to the accused in the courtroom and tell the jury that is the individual he saw at such and such a time and place. Since the majority concedes it was not error for Joe Williams to do that, it seems appropriate to ask, why is the case being reversed? We do

not reverse cases for another trial on abstract principles, but on prejudicial errors that affect the outcome of the trial. See *Novak v. State*, 287 Ark. 271, 698 S.W.2d 499 (1985); *Davies v. State*, 286 Ark. 9, 688 S.W.2d 738 (1985); *McFarland and Soest v. State*, 284 Ark. 533, 684 S.W.2d 233 (1985); and *Berna v. State*, 282 Ark. 563, 670 S.W.2d 435 (1984). I submit that if the witness can properly identify the appellant as the man he saw in his service station, it is wholly abstract on this record, to hold that the case must be reversed because he also testified appellant is the man he saw in a lineup.

Appellant, like the majority, cites *Moore v. Illinois*, 434 U.S. 220 (1977); *United States v. Wade*, 388 U.S. 218 (1967); and *Gilbert v. California*, 388 U.S. 263 (1967). Those cases do not hold that a breach of an accused's right to have counsel at a lineup prevents a witness from so testifying, provided the evidence clearly shows the identification was based on the witness's contact with the accused and not suggested by the lineup. Even in the latter instance, if the error can be declared harmless beyond a reasonable doubt the case should not be reversed. LaFave and Israel, *Criminal Procedure* § 7.3(f) (1984). Neither the appellant nor the majority examine the issue from the standpoint of harmless error. Where the evidence of guilt is convincing, even constitutional errors may be cured if it can be said beyond a reasonable doubt the error is harmless. *Harrington v. California*, 395 U.S. 250 (1969). Here, the two victims were murdered by someone with whom they were acquainted; there was no evidence of robbery or burglary as a motive; John David Hefley, aged 5, identified the appellant as being in the home of the victims at the time of the murders. Appellant's thumb print was found on a coffee cup in the room with the victims. Appellant was seen in Conway, Arkansas by Joe Williams between two or three o'clock after the murders. Appellant was shown to have been driving a 1970 pickup with milk cartons in the back and a truck matching that description was seen leaving the house soon after sounds like shots were fired. The truck sped away and objects in the truck bed were heard to slide from one side of the truck to the other. I believe that proof, balanced against the asserted error, justifies a determination that the error complained of was harmless.